## Case No. 11,949.

ROBINSON v. COMMONWEALTH INS. CO.

[3 Summ. 220.] [1]

Circuit Court, D. Massachusetts. May Term, 1838.

MARINE INSURANCE— PERISHABLE GOODS — TOTAL LOSS—ABANDONMENT — HALF VALUE—SHIPPING—AUTHORITY OF MASTER TO SELL.

1. Potatoes are deemed perishable articles, within the memorandum of a policy of insurance.

[Cited in Silloway v. Neptune Ins. Co., 12 Gray, 85.]

2. Where there is an insurance on a perishable cargo, there can be no recovery against the underwriters, unless in a case of the total loss of the cargo, by some peril insured against; not even if 99 per cent. be lost.

[Cited in brief in Howland v. India Ins. Co., 131 Mass. 252.]

3. It is total loss, where by reason of the perils insured against, the cargo is permanently prevented from arriving at the port of destination.

[Cited in brief in Thwing v. Washington Ins. Co., 10 Gray, 448.]

4. If a vessel is injured during her voyage, to half her value, and no other vessel can be found to carry on the cargo to her port of destination, or, if the vessel, though reparable, cannot be repaired within a reasonable time, and before the cargo, being of a perishable nature, will be irretrievably destroyed by the delay to repair, in such a case the insured may abandon, and recover for a total loss.

5. With regard to the half value, the rule is, that the vessel, after she has been repaired, shall be of double the value of the cost of the repairs, without any deduction of one third new for old; and, that the deduction of one third new for old, is solely applicable to cases of partial loss, where the owner has come again into possession of the vessel, and has received the benefit of the repairs.

[Cited in brief in Heebner v. Eagle Ins. Co., 10 Gray, 142.]

6. The clause in the policy, "that the insured shall not have the right to abandon the vessel, for the amount of damage merely, unless the amount, which the insured would be liable to pay, under an adjustment for a partial loss, shall exceed half the amount insured," is solely applicable to the case of an insurance on the ship, and has nothing to do with an insurance on cargo.

7. The master has authority to sell the ship only in cases of extreme necessity; but this

[1] [Reported by Charles Sumner, Esq.]

necessity is not physical, but moral, amounting to a strong and vehement exigency. It may be properly determined, by considering, whether, under like circumstances, a sale would have been made by a considerate owner, for his own interest and that of all concerned.

[Cited in Fitz v. The Amelie. Case No. 4,838; The Lucinda Snow, Id. 8,591.]

[Cited in Prince v. Ocean Ins. Co., 40 Me. 490; Stephenson v. Pacific Mut. Ins. Co., 7 Allen, 235; Tudor v. New England Mut. Mar. Ins. Co., 12 Cush. 557.]

8. A master may be presumed, in ordering the sale of his ship, to have done his duty properly, if there are no proofs to the contrary.

9. In questions of a commercial and general nature. the courts of the United States are not positively bound by the decisions of the state courts.

[Cited in Faulkner v. Hart, 82 N. Y. 418.]

This was an action on a policy of insurance, dated on the 16th of January, 1837, whereby the company insured for the plaintiff, "one thousand dollars, on property on board the schooner Pantaloon, at and from Portsmouth to Baltimore, also four hundred dollars more, at the same risk, for the assured," at one per cent. premium. The policy contained the usual clause in Boston policies, that "the insurers shall not be liable for any partial loss, on hemp, flax, &c, &c.; nor for any partial loss, on salt, grain, fish, fruit, hides, skins, or other goods, that are esteemed perishable in their own nature, unless it amount to seven per cent. on the whole aggregate value of such articles, and happen by stranding," &c., &c. The breach alleged in the declaration was a total loss by the perils of the seas. Plea, the general issue. At the trial, it appeared that the cargo insured consisted principally of potatoes, the remaining part consisting principally of fish. The cargo was taken on board in January, 1837, and the schooner sailed on the voyage in the same month. On her passage, she encountered a very severe gale of wind, and was thrown upon her beam ends, and remained so for several hours; and had six feet of water in her hold, and lost a great part of her sails and rigging, and spars. She was afterwards righted, and encountered, in succession, two other very severe gales, in one of which she lost her compass and log-book; and drifted about, for some time, at the mercy of the winds and waves. She finally, after sixty-seven days, arrived at the Island of St. Martin's in the West Indies. The master there caused a survey to be had upon the schooner, and in pursuance of the recommendation of the surveyors, the vessel was sold, and the voyage was broken up. When the schooner arrived at St. Martin's, the fish was totally destroyed, and the potatoes were nearly all rotten, or so much injured as to be of little value; and the whole of the cargo was sold for a very small sum, being a balance only of about thirty dollars, as the net proceeds. It was in proof. that there was but one other vessel in the port of St. Martin's capable of carrying on the cargo to its port of destination; and

that vessel had a cargo on board, and was bound on another voyage. There was also evidence, that the cargo was in such a state, as that it was incapable of being carried to the port of destination, without a total destruction of it by rot and decay. There was also evidence, that while the potatoes were taken on board at Portsmouth, some of them were injured by the frost. No direct evidence was offered of the extent of the injury to the vessel, or of the costs of the repairs at St. Martin's, or of the particulars of the survey. The surveyors were not examined as witnesses. The survey was offered as evidence by the plaintiff; but was objected to by the defendants, and was ruled out by the court. So that the principal evidence of the extent of the injury, and of the costs of the repairs, was of a mere circumstantial nature, from the testimony of the master. of the extent of the injury, and the fact of his having sold the vessel. The vessel was nearly new, having been built in 1836.

Choate & Sewall for defendants, rested the defence upon the following points. (1) That potatoes were perishable goods, within the clause of the policy; which point THE COURT sustained, and held, that they were to be deemed perishable. (2) That the potatoes were injured by frost, when they were taken on board at Portsmouth, and they were, therefore, not injured or destroyed by a peril insured against. (3) That the vessel was not insured to one half her value, and might have been repaired, and the cargo carried to Baltimore; and that in calculating the value, there should be a deduction of one third new for old. (4) That unless there was a total loss of the cargo by some peril insured against, or the cargo in its damaged state could not be carried on to Baltimore in the same vessel, or in another vessel. the plaintiff was not entitled to recover. (5) That there was no sufficient evidence in the case, that another vessel could not have been procured to carry the cargo to Baltimore, and no sufficient proof of any efforts made by the master to procure one.

C. G. Loring, for plaintiff, admitted, that potatoes were perishable goods, within the meaning of the clause in the policy. But he contended, that the damage to the cargo was solely attributable to the perils of the seas, and not to the frost. He also contended, that the voyage was broken up from necessity, and the sale of the vessel was justifiable; and that the plaintiff was entitled to recover for a total loss under all the circumstances.

STORY, Circuit Justice (charging jury). The principle of law is very clear, that, as this is an insurance on a perishable cargo, the plaintiff is not entitled to recover, unless there has been a total loss of the cargo by some peril insured against. If the schooner had arrived at the port of destination. with the cargo on board, physically in existence, the plaintiff

would not have been entitled to recover, however great the damage might have been by a peril insured against, even if it had been 99 per cent., or in truth even if the cargo had there been of no real value. This seems to be the result of the authorities; although it is certainly pressing the principle of the memorandum clause to an extreme.[2] But in the present case, the cargo never did arrive at the port of destination. The question then is, whether there has been a total loss of the voyage and a non-arrival, by the peril of the seas. Now, the underwriters undertake that the cargo shall be capable of arriving at the port of destination, notwithstanding any of the perils insured against. It is, therefore, an insurance on the cargo for the voyage; and if, by reason of the perils insured against, the cargo is permanently prevented from arriving at the port of destination, that constitutes a total loss, for which the insured is entitled to recover, upon a policy like the present. If the vessel, during the voyage, is injured by the perils of the seas to the extent of half her value, and no other vessel can be procured to carry on the cargo to the port of destination; or, if the vessel, though reparable, cannot be repaired within a reasonable time, and before the cargo, being of a perishable nature, will be irretrievably destroyed by the delay to repair; in such a case, the insured is entitled to abandon, and recover for a total loss.[3] In calculating the half value, the rule laid down by the supreme court of the United States is, that the vessel, after she has been repaired, must be of double the value of the costs of the repairs, without any deduction of one third new for old; and that the deduction of one third new for old, is not to be made in cases of this nature; but is solely applicable to cases of a partial loss, where the owner has come again into possession of the vessel, and has received the benefit of the repairs.[4] I am aware, that a rule somewhat different has been laid down by the supreme court of Massachusetts, for whose judgments I entertain the most unfeigned respect.[5] But questions of a commercial and general nature, like this, are not deemed by the courts of the United States to be matters of local law, in which the courts of the United States are positively bound by the decisions of the state courts. They are deemed questions of general commercial jurisprudence, in which every court is at liberty to follow its own opinion, according to its own judgment of the weight of authority and principle. On the present occasion, I feel myself bound to follow the doctrine of the supreme court of the United States, by whose judgment, indeed, I am bound; although, even as a new question, I have no hesitation to say, that I entirely concur in that judgment. The clause in the policy, "That the insured shall not have the right to abandon the vessel for the amount of damage merely, unless the amount, which the insured would be liable to pay under an adjustment for a partial loss, shall exceed half the amount insured," does not vary the principle; for it is solely applicable to the case of an insurance on the ship, and has nothing to do with an insurance on cargo.

The questions, then, for the jury to decide on this point, are; (1) whether the vessel could have been repaired at St. Martin's at all, or at a cost not exceeding half her value, after the repairs were made in a reasonable time to carry on the cargo to the port of destination. (2.) Whether, if she could be repaired for less than the half value, she could have been repaired before the cargo would have been so deteriorated as to have lost all value, or to have been totally destroyed. (3.) Whether, if the vessel were not so reparable, another vessel could have been procured to carry on the cargo to the port of destination, in its then damaged state. If the jury should find all these points in the negative, then the plaintiff will be entitled to recover, so far as this question as to the totality of the loss is concerned. Otherwise, he will not be entitled to recover at all in the present case.

In regard to the necessity of the sale, it is to be regretted that the usual evidence in these cases, the survey, and the testimony of the surveyors, as to the state of the vessel, and the nature and extent of the repairs, and the expense of making the repairs, or even the practicability of making the repairs, are not before the court. It is certainly unusual for the assured to go to a trial, without the production of such documents and proofs. But it is also unusual for the other side wholly to rely upon the mere absence of such documents and proofs, and to make no inquiries, as to the state of the ship and the other facts, when they have been called upon to cross-examine witnesses, who might have spoken to such facts. Still, the plaintiff, notwithstanding the deficiency and infirmity of the direct proofs in these particulars, may rely, if he chooses so to do, upon the inferences deducible from the facts positively in evidence, as to the state of the ship, and the practicability and the costs of the repairs, and the necessity of the sale; and it will be for the jury to decide whether, under these circumstances, they are enabled to arrive at a satisfactory conclusion as to the facts, and as to the necessity of the sale. Now, certainly, the master has an authority to sell only in cases of extreme necessity, not indeed of physical necessity, but of moral necessity. By moral necessity, I understand, not an overwhelming and irresistible calamity or force; but a strong and urgent, and, if one may so say, a vehement exigency,

---

[2] See Marcardier v. Chesapeake Ins. Co., 8 Cranch [12 U. S.] 39; Morean v. Chesapeake Ins. Co., 1 Wheat. [14 U. S.] 219; Dyson v. Rowcroft, 3 Bos. & P. 474; 3 Kent. Comm. (3d Ed.) 298, 299.

[3] Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 604.

[4] Bradlie v. Maryland Ins. Co., 12 Pet. [37 U. S.] 378.

[5] Deblois v. Ocean Ins. Co., 16 Pick. 303, 313.

which justifies and requires the sale to be made, as a proper matter of duty to the owner, to prevent a greater sacrifice, or a total ruin of the property. In short, I know not, how better to put the case of such a moral necessity, than to say, that it is such an act of sale, as under like circumstances, a considerate owner, who was uninsured, would adopt for his own true interest, and that of all concerned in the voyage.[6]

In cases of a sale of the ship by the master, it is certainly not sufficient, that he has. acted with good faith, and in the exercise of a fair discretion; but he must also have acted under the pressure of a moral necessity, such as has been already suggested. But the actual conduct of the master is certainly an ingredient to be taken into consideration, in connexion with the other circumstances, in order to ascertain the fact of the necessity of the sale. It is certainly the duty of the master, both to his owner and to the shippers, to repair the ship, and continue the voyage, if it can be done at a reasonable expense. It is equally his duty not to sell the ship, except in cases of necessity. Now, it is a general principle of law, that every man is presumed to do his duty, until the contrary is shown; and, a fortiori, this doctrine applies to the perilous responsibility of a master in ordering a sale of his ship. This presumption ought not, indeed, to prevail in the absence of all other proper proofs of the necessity of the sale; but it is certainly an ingredient, fit for the consideration of the jury, in cases like the present.

The judge then summed up the evidence on the other points made in the defence, and left the whole matters of fact to the jury, intimating, however, a strong opinion, that the weight of evidence was, that the damage to the potatoes was not by frost, but by the perils of the seas; and that there was no other vessel at St. Martin's, in which the cargo could have been carried to Baltimore. The jury found a verdict for the plaintiff, for a total loss. A motion was afterwards made for a new trial by the defendants.

―――

ROBINSON (CORPS v.). See Case No. 3,252.

ROBINSON (CROWNINSHIELD v.). See Case No. 3,451.

---

[6] See 1 Phil. Ins. (1st Ed.) 409, 410; 2 Phil. Ins. (1st Ed.) 291-296; Abb. Shipp. pt. 1, c. 1, p. 10, and note; 3 Kent, Comm. (3d Ed.) lect. 46, pp. 174, 175, and note; Winn v. Columbian Ins. Co., 12 Pick. 279; Gordon v. Massachusetts Fire & Marine Ins. Co., 2 Pick. 264, 265; Hall v. Franklin Ins. Co., 9 Pick. 466; Hayman v. Molton, 5 Esp. 65; Idle v. Royal Exch. Assur. Co., 3 Moore, 145, 148, 8 Taunt. 755; Green v. Royal Exch. Assur. Co., 6 Taunt. 68; Read v. Bonham, 3 Brod. & B. 147; Robertson v. Caruthers, 2 Starkie, 571; Robertson v. Clarke, 1 Bing. 445; Allen v. Sugrue, 8 Barn. & C. 561; Somes v. Sugrue, 4 Car. & P. 276; Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 604, 620.