## HALL *v.* OCEAN INS. CO.

*(Circuit Court, D. Maine.* January 12, 1889.)

MARINE INSURANCE—TOTAL LOSS—SALE—AUTHORITY OF MASTER.

A vessel laden with coal, valued at $9,000, struck on the beach, on the west side of Block island, about 10 o'clock at night, and in a thick fog. She lay on a sandy beach, with rocks and stones under and around her, nearly on an even keel, and head on to the beach, but so that she was broadside to the sea. On the next morning the wind increased somewhat in violence, and as the tide arose the vessel chafed heavily; and about 10 A. M. bilged, and filled with water. The master applied to a wrecking company, who offered to get the vessel off for $5,000. The following day the owner's agent arived. The weather had moderated somewhat. A survey was called, and four days later the vessel was sold at auction for $610. The vessel was in an exposed condition, and local witnesses testified that a large proportion of coal vessels which are bilged on that part of the island become a total loss. *Held,* that the master was justified in making the sale, and the insurers liable for a total loss, though the vessel was afterwards saved.

In Admiralty. Libel on insurance policy.

*Benjamin Thompson,* for libelant.

*A. A. Strout* and *S. Park,* for respondent.

CARPENTER, J. This is a libel in admiralty, wherein the libelant claims as for a total loss on a policy of insurance signed by the respondents, January 10, 1887, on his twenty-two sixty-fourths interest in the bark Georgietta, which went ashore on Block island June 22, 1887. The master called a survey, and in accordance with the advice of the surveyors advertised the vessel for sale, and sold her by auction. Before calling the survey, he communicated with the owners of the bark in Portland, and they sent an agent to Block island, who advised with the master as to the course proper to be pursued. After the vessel was sold, the purchasers hauled her off the beach, and towed her to New London, where she was temporarily repaired. The vessel, therefore, was not made a total loss solely by the fact of her stranding, but she became such, if at all, by means and in consequence of the sale by auction. The question, therefore, is whether the master had authority to make the sale in such manner as to bind the underwriters.

The respondents set up in their answer that the vessel went ashore through the fault of the master and crew, but this defense was not seriously pressed in argument, and I find nothing in the testimony to support it. I also find as matter of fact on the testimony, that the master acted in good faith in the matter of the sale of the vessel. The main argument of the respondents is in support of the position that the master can have no power to sell the vessel so as to bind all parties concerned, including the underwriters, in a case where it is possible that the owners should be notified of the peril of the vessel, and should have an opportunity to direct the master. To this point many decisions have been cited, and the whole question has been very thoroughly and acutely argued. The cases are not altogether in accord, and the rules of decision

laid down at different times will seem to be widely divergent if stress be laid on the literal meaning of the terms employed. But I have come to the conclusion, after very full consideration, that the only test of the power of the master to sell is to inquire whether the vessel was in such a situation that to sell her was the only prudent and wise course. It is said in the cases that the sale must be by necessity; but I do not understand that, in order to show a necessity for a sale, the master must show that no other course was open to him. It is sufficient if he show that there was no other prudent course. This statement of the rule I take to be in accordance with the general line of decision heretofore, and with the reason of the case.

The question then recurs whether the situation of the vessel was such as to make the sale, under the circumstances, and as a matter of prudence, a necessity. The vessel is valued in the policy at $9,000. On the 17th of June she left Philadelphia with a cargo of coal, bound to Portland. On the 22d of June, at about 7 o'clock in the evening, she was about five miles south from Montauk Point light. The weather was foggy, the wind was about south-west, and there was a heavy sea. From Montauk Point the ship was steered east by north, nothing to the northward, which would have carried her four miles to the southward of the south end of Block island. Shortly after 7 o'clock a thick fog shut down, and continued until about 10 o'clock, at which time the vessel, evidently carried to the northward by the tidal current, struck on the beach on the west side of the island. She lay on a sandy beach, with rocks and stones under and around her, very nearly on an even keel, and nearly head on to the beach at the point where she struck, but so that she was broadside to the sea as the sea was then running. On the next morning the wind increased somewhat in violence, and as the tide rose the vessel chafed heavily on the rocks, so that a few small holes were worn entirely through her bottom. At about 10 o'clock in the forenoon she bilged, and filled with water. The master applied to the manager of the wrecking company on the island, and the best terms he could obtain was an offer to get off the vessel for $5,000. On the 24th, Captain Merrill, the agent of the owners, arrived on the island. In the mean time the weather had somewhat moderated. On the 25th the survey was called, and on the 28th the vessel was sold by auction for $610. The purchasers were occupied from June 30th to July 3d in attempts to haul her off the beach, and on the last-named day she came off, and was towed to New London, being kept free from water by a steam-pump which was put on her deck. The cost of getting her off was about $650. She was strained and leaking badly, but the amount of damage received by her is exceedingly difficult to estimate from the widely varying statements of the witnesses. The special danger in which the vessel lay, while ashore on Block island, arose from her exposed situation, and the liability to an unfavorable change of weather. As she was full of water, it was, of course, impracticable to float her by the unaided exertions of the crew. In those waters the prevailing winds during the summer season are from the westward, and sudden and violent storms of wind frequently arise. It is also

a common occurrence that surf from storms at sea suddenly breaks on the west shore of Block island with force sufficient to break up vessels lying ashore. It is stated by witnesses resident on the island that a large proportion of coal vessels which are bilged on the west shore of the island become ultimately a total loss.

Taking the whole circumstances of the case, I am of opinion that no course was open to the master except to sell the vessel. Had he contracted with the wrecking company for the price offered, they would have been able, as the event was, to get off the vessel, and tow her to a harbor, where she might be repaired. But even in that case, so far as I can understand from the testimony, the sum paid to the wreckers, and the cost of repairs so as to make the bark seaworthy, would together have amounted very nearly to the value of the vessel as she was before she struck. But it is not even on this basis, as I apprehend, that the question is to be decided. The peril of the ship cannot be measured by the ultimate result of the efforts to save her. I am to look at the danger in which she was, rather than to the damage which she received. It is common experience that a ship is in mortal peril for many hours and, in the final result, escapes with no damage whatever. I conclude, therefore, that the libelant is entitled to recover as for a total loss, with allowance for the savings from the sale.