[Civ. No. 1999.   First Appellate District.—February 14, 1918.]

AMOK GOLD MINING COMPANY, Respondent, v. CANTON INSURANCE OFFICE, LIMITED, Appellant.

MARINE INSURANCE LAW—ARRIVAL OF FREIGHT AT DESTINATION—INSUFFICIENCY OF EVIDENCE.—In this action upon a policy of marine insurance covering the shipment of mining supplies from Seattle, Washington, to Uyak, Alaska, it is held that the evidence is insufficient to show that the vessel ever reached the destination contemplated by the policy.

ID.—STRANDING OF VESSEL—BURDEN OF PROOF.—In an action on a policy of marine insurance, where it is contended that the vessel stranded, the plaintiff has the burden of proof.

ID.—STRANDING OF VESSEL—MEANING OF.—The word "stranded" means that the vessel must remain stationary for a time, and implies a settling of the vessel and an interruption of the voyage under extraordinary circumstances.

ID.—CONSTRUCTION OF TECHNICAL LANGUAGE—QUESTION FOR JURY.— Where language somewhat technical in character, or if not technical, at least colored by the manner of expression of seafaring men with which landsmen are more or less unacquainted, is to be construed, it is far safer to leave the meaning thereof, with all the circumstances in mind, to the jury, than for courts to lay down a hard and fast rule as to what the language means.

ID.—REFUSAL TO ACCEPT FREIGHT—BURDEN OF PROOF.—In an action on a marine insurance policy, where the defendant contends that the insured refused to receive the goods, the burden of proof is upon the defendant to prove the issue.

ID.—ABANDONMENT OF WRECKED VESSEL — SALE — RIGHT OF MASTER. In an action on a marine insurance policy, the right to sell as well as the right to abandon the wrecked vessel must be determined by the master in the light of the facts available at the time, and he may not await the developments of subsequent facts before deciding what to do.

ID.—RIGHT TO SELL WRECKED VESSEL—SUBSEQUENT REPAIR.—The fact that a wrecked vessel was subsequently repaired by the purchaser does not show that a sale was not necessary.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.   John Hunt, Judge.

The facts are stated in the opinion of the court.

Andros & Hengstler, and Golden W. Bell, for Appellant.

Ira S. Lillick, for Respondent.

BEASLY, J., *pro tem.*—This is an action upon a policy of marine insurance, in which plaintiff recovered a verdict of $1,923, interest and costs; and defendant appeals from the judgment entered thereon.

By the policy the defendant insured mining supplies consisting of fifteen hundred feet of fuse, five drums of gasoline, one ton of sacked coal, seven tons of dynamite and 1M blast caps, "in the power schooner 'Harold Blekum' at and from Seattle, Washington, to Uyak, Alaska." Subject to the effect of certain conversations between the master of the schooner and the owner, it is conceded that the underwriters were liable upon the policy until the goods could be discharged and safely landed at Uyak, Alaska; and the first question on which counsel disagree is the meaning to be attached to the words "to Uyak."

To persons unacquainted with the remote coasts and harbors of the Alaskan peninsula and the conditions existing there this would seem an easy question, but it is not so under the facts of the case, and in view of the varied adventures which befell the schooner on its unlucky voyage. The facts are such that these words must be defined in view of all the surrounding circumstances and conditions; and some light may be shed upon their meaning by another question, namely, Where was it intended that the goods should be landed from the "Harold Blekum?"

Uyak Bay is a deep inlet from the Shilikof Strait into Kodiak Island. There was in January, 1915, when the "Harold Blekum" arrived there, a cannery, a store, and a postoffice situate near the mouth of the bay, and marked "Uyak" on the maps in evidence at the trial. There were other canneries and also mines at various points on Uyak Bay, and among the mines that of plaintiff situate some twelve or fifteen miles up the harbor. One witness testified that there is no such thing as a town at Uyak. In the busy season of the cannery there were four or five hundred people there, but in winter there was a caretaker and three or four other persons who lived in the neighborhood. The evidence

discloses that the plaintiff had been shipping for ten or twelve years up there; that their cargo was always marked "Uyak," and that the ships, to use the language of one of the witnesses, "came right to our place, Uyak. They stopped at the cannery on the way back," and that the manager of the Mining Company expected that the captain would bring the cargo up to the mine, "and," said one of the witnesses, "the mine is as much a part of Uyak as the cannery is a part of Uyak." There is no public landing at the cannery but only a private wharf of the canning company. Upon this the cargo insured by the defendant could not be discharged; and this "point on the map," as it is called by one of the witnesses, is on the opposite side of the bay from the Amok mine, and distant twelve or fifteen miles therefrom. The bay is from one to five miles wide and is a deep-water harbor up to the mine. The "Harold Blekum" was not permitted to tie up to the cannery wharf, but having done so without permission temporarily, was promptly ordered away.

Another incident bears on the question of the destination of this freight. The "Harold Blekum" had on board as merchandise thirteen thousand feet of lumber, and this lumber the manager of the Amok mine, while the schooner was off the cannery, agreed to purchase, it being clearly intended by both him and the captain of the schooner that this lumber should be delivered at the mine.

Counsel for the defendant accumulates much persuasive evidence in support of his contention that the terminus *ad quem* of this voyage was the cannery; but while we might so find if it were left to us we must, nevertheless, under the well-known rule, leave the defendant to the finding of the jury on this point, which, to support the verdict, must be presumed to have been that the terminus *ad quem* as to the insured cargo involved in this case was the mine and not the cannery.

But conceding that the destination was the cannery, it is still not apparent that the "Harold Blekum" ever actually reached that port in the sense in which this policy contemplates. She arrived off the cannery wharf in the roughest kind of wintry weather; she tied up to the wharf for a very brief space of time without permission and was promptly ordered away. She was never in a position in which cargo

could be unloaded.   Where she lay, as the witnesses testified, it was impossible to discharge the cargo, and this was in part on account of injuries which the schooner had sustained by reason of a storm which she had encountered, and in part by reason of the position in which she lay.   She was compelled, as we shall hereafter see, to leave the bay without discharging this cargo, and to proceed to Kodiak, and she never returned to the bay.   To have reached the terminus *ad quem* of the voyage as it concerned this insured cargo she must have come into a position in Uyak Harbor at least from which this cargo could have been discharged and at which the owners could have received it; in other words, to a place where the master of the ship had a right to demand that the owner of the cargo should receive it at his hands.   She never came into such a position.

The history of this voyage throws light on all the questions involved in this case.   The "Harold Blekum" departed from the port of Seattle on the first day of December, 1914, bound ultimately for Unga, Alaska, where she had cargo to discharge, and with the insured cargo on board.   On December 26th, while at Karluk anchorage, the schooner encountered heavy weather off the entrance to Karluk Bay.   A black squall with snow struck her and she pitched bows under, and being at the time at anchor started to drag toward the shore. The master and crew, fearing an explosion of the caps which formed a part of this cargo, jettisoned them.   The vessel cleared soon after, and the master put her before the wind for Uyak; but two hours later, in a terrific woolly, she lost much of her rigging.   She was finally again brought to anchor in fourteen fathoms, but the heavy weather snapped her moorings and she went adrift.   The mainsail still held though much damaged, and it was set and an attempt made to beat up to the cannery wharf, but the snow blinded the crew and she got too close to the west shore, missed stays, and to save the vessel three iron rails were jettisoned on the end of the fore-deck with ropes attached.   One parted and the other two held.   The vessel was then "right amongst the rocks."   The crew, fearing that when she started to pound at low tide the dynamite might be exploded, and also with the indication of a dirty night, refused to remain on board and landed on the beach.

The subsequent history of the schooner's adventures can be best discussed after understanding the question for the consideration of this court which arose from them, namely, whether the schooner stranded. It is conceded that if the vessel stranded the warranty was opened.

The question whether she stranded is earnestly presented on both sides, the defendant contending that there is no evidence that the vessel ever stranded, and that as a matter of law it appears from the evidence that she did not strand; and the plaintiff asserting that there was sufficient evidence that the vessel did strand to warrant the jury in finding the fact, and that the whole question is one of fact for the jury.

The burden of proof of the stranding is, as contended by appellant, upon plaintiff.

On the morning following the abandonment of the vessel the master and mate, with one Peter Petrofskey, found the vessel, quoting the log, "on east shore of the bay with two irons still down and one foot of water under her at high water." There was no evidence as to whether it was then high water or not. They pumped her out, and the master and mate, using the anchor and line of Petrofskey's launch, kedged her into deep water, slipping the lines on the irons.

The contest of counsel is over the meaning of the words "on east shore" found in the log of the schooner. Defendant contends that this expression means that she was found near the east shore but still afloat. Plaintiff contends that the words, taken with other evidence, were sufficient to justify a jury in finding that she had stranded. The other evidence is found in a survey of the vessel subsequently made at Kodiak, and which showed the false keel of the schooner to be torn off sixty-five feet abaft the fore-rigging, and the main keel considerably bruised and battered, the stern started and the bolts driven inward over a distance of about six inches, six butts on the bottom and the stanchions on the port side started, and thirty feet of the rail crushed inward; the deck strained and the rigging badly battered; the windlass strained, the spindle bent, and all the anchors missing. There was no evidence that the ship had been aground at any time between the occasion when she was kedged into deep water from her position on the morning of the 27th of December and the time when she was surveyed at Kodiak; nor

any evidence that this damage was done before the crew abandoned her on the afternoon or evening of December 26th.

The meaning of the word "stranded" is well settled. The vessel must remain stationary for a time. Stranding implies a settling of the vessel, some rest or interruption of the voyage under extraordinary circumstances. If the ship merely touch and go she is not stranded, but a settling of the ship on land, be it rocks or bar or shore, so that she be stationary for even a brief period is a "stranding." (26 Cyc. 654.) Neither the master nor any member of the crew was a witness. Probably after the lapse of time between the catastrophe and the trial they were unavailable. Some of the considerations which the jury may have taken into account in construing this language are obvious. A ship left unattended and with so slight a fastening as the two jettisoned railroad irons in a wintry season, with a storm so severe as to cause the crew and the master to abandon her, might reasonably be supposed to have drifted until she came up against something solid enough to hold her; and the only substantial thing here was the east shore of the bay. The jury had a right to consider the state of the tide as a matter of judicial notice; but in addition to this the rise and fall of the tides at Uyak Bay appear to some extent from the maps in evidence. The fact that she had only a foot of water under her at high tide; that the tide rises and falls fourteen feet at that point; that the vessel drifted from early in the afternoon of the 26th to the morning of the 27th at a time when the daylight hours were very short in that latitude, and the condition of her bottom when surveyed—which was such as to show that she had pounded on the beach or rocks for a considerable period—all were circumstances which the jury had a right to consider in construing the words "on east shore of the bay."

Where language such as this, somewhat technical in character, of if not technical, at least colored by the manner of expression of seafaring men with which landsmen are more or less unacquainted, is to be construed, it is far safer to leave the meaning thereof, with all the circumstances in mind, to the jury, than for courts to lay down a hard and fast rule as to what the language means; and, indeed, this is in line with the authorities on this point of practice. The

jury are always the judges of the meaning of language employed by witnesses unless the meaning admits of no substantial doubt (*Carpenter* v. *Fisher,* 175 Mass. 9, [55 N. E. 479]; *Snyder* v. *Bougher,* 214 Pa. St. 453, [63 Atl. 893]; *Reel* v. *Elder,* 62 Pa. St. 308, [1 Am. Rep. 414.]). In view of this rule we do not feel that we can disturb this finding.

Another question earnestly debated is whether the goods were stowed under deck.

The insurance was on the goods while "under deck" only. The defendant insists that there was no evidence that these goods were under deck; and here again counsel disagree as to the construction to be placed upon a particular part of the evidence. Mr. Erskine, a business man of Kodiak, who purchased the schooner at her sale, was examined as to the condition of the cargo. In the course of his examination by counsel for plaintiff he was asked if from his examination of the cargo made at Kodiak he could state whether or not the damage from salt water had occurred ten or fifteen days before the cargo was discharged at Kodiak, and answered that he could do so. The court, interrupting counsel, then asked him how he could do this, and he answered as follows: "For instance, the sugar and some of the flour was moldy. It was not very wet at the time we received it; it had been wet and had dried to some extent, and the mold had started." Thereupon counsel for plaintiff, resuming his examination, asked the following question: "Where was that particular cargo in the hold of the vessel with reference to the parts of the deck that were open?" The witness answered, "Well, it was under the damaged part of the deck." The court then again took the examination on itself and asked two or three questions. This, in effect, is the only direct evidence in the record on the question of whether the goods were under or above deck. It is very evident to anyone with even a sometime passenger's knowledge of the sea that with weather such as that encountered by the schooner no cargo such as this stowed on deck would remain fast. At least it must be said that the jury from these physical facts might have inferred that this cargo was under deck, since it remained on the schooner until it reached Kodiak. In addition to this, no other reasonable construction can be given to the question asked of the witness by counsel above quoted than that both he and the witness referred to the particular part of the

cargo involved in this action, that is, to the cargo insured by the defendant for the plaintiff here. The court, it is true, interjected a question of its own in the course of the examination; but counsel's examination was directed to ascertaining where this particular cargo, namely, the cargo which was the subject of this action, was stowed, and the witness answered that it was under the damaged part of the deck.

It seems to us that any other construction than that placed upon the evidence by the jury would have been strained indeed; and it certainly does not lie with this court to say that the jury could not have understood counsel and the witness to refer to the cargo involved in this action, and not to the sugar and flour mentioned by the witness in answering a question incidentally propounded by the court in the course of the examination. We will let this finding stand.

Chronologically at this point the question arises whether the insured refused to receive the cargo while the schooner was at Uyak. Counsel for defendant claim such refusal, which claim is contested by plaintiff's counsel.

We have seen that the jury must have found that the cargo did not reach its destination; but certain conversations and circumstances in which Cornell, the Mining Company's manager, and Captain Timm, the master of the schooner, figured while the vessel was off the cannery is the basis for the defendant's claim that the plaintiff refused to accept delivery of the cargo.

Here again we think the conversation open to two constructions, of which it must be assumed that the jury adopted that most favorable to the plaintiff. Let it be noted that here the burden is upon the defendant. Cornell met Captain Timm at the cannery on the morning of the 27th of December. He testified positively that no time was given him in which to discharge the cargo if he had tried; that he could not have done so without the consent of the captain; that he could not have taken it off in the condition in which the schooner lay at that time, and also that he had no men at the mine whom he could have sent out to get the cargo if it could have been discharged where the schooner lay. The caps had been jettisoned, as we have seen, and could not be delivered. There are two or three versions of these events in the transcript. The captain told Mr. Cornell that he had jettisoned the caps.

The latter then said that the powder was of no use to him and he could not receive it without the caps. The captain then volunteered to get other caps. He went to Kodiak, which was only eight or ten hours' journey by launch from the cannery; but instead of returning and taking the cargo up the bay, as he and Cornell evidently expected that he would, the captain brought back a launch from Kodiak and towed the schooner to that port. That there was a misunderstanding between the two men is possible—even probable; but there is no evidence here from which the jury was bound to find that Cornell refused to receive this cargo. Two letters of Cornell to the president of the Mining Company, and a letter from the latter to the agents of the underwriters, give slightly different versions of this conversation from that contained in Cornell's testimony; but the burden of proof resting upon defendant to show the refusal of the plaintiff to accept delivery was not sustained—at least we cannot say that the jury were wrong in determining that it was not.

After she had been hauled off shore the schooner was taken to Kodiak, and after survey and notice she was sold. And here we meet the next question in the case, and that is, whether the master was justified in taking her to Kodiak and making the sale.

There can be no question that the storms had greatly damaged the rigging and hull of the vessel. Her crew had abandoned her. She was, it is fair to say, in a dangerous condition. The extent of her damage was not known or ascertainable at Uyak. She could tie to no wharf there; there was no dock in which she could lie. The master was no doubt justified in concluding that his ship could not safely sail from there under her own power. Her crew refused to serve her further without a survey to ascertain the extent and character of her damage. The law requires that in such cases the master must communicate with the owners; and Captain Timm accordingly went to Kodiak, the nearest port from which such communication was possible. When there he at once wired the owners reporting the wreck and the condition of the vessel, and received the reply ''to use his best judgment and to act for all concerned.'' He arranged accordingly to have the vessel towed to Kodiak, where there were ship's carpenters, seamen, and others competent to make sur-

36 Cal. App.—18

vey of her damage, and repairs if possible. That this was the only course that the master could in reason pursue seems very clear to us. It is easy to argue what might have been the better or more economical course; but this master faced the perils of the sea in a high latitude, subject to terrific storms on a treacherous coast in the depth of winter, with a vessel which was practically a wreck. We cannot say now that he did not exercise his best judgment in doing what he did.

The right to sell as well as the right to abandon must be determined by the master in the light of the facts available at the time, and he may not await the development of subsequent facts before deciding what to do (*Fuller* v. *Kennebec Mut. Ins. Co.*, 31 Me. 325); and, of course, the question of whether a sale was necessary was a fact for the jury (*Delaware Ins. Co.* v. *Winter*, 38 Pa. St. 176; *Robinson* v. *Commonwealth Ins. Co.*, 3 Summ. 220, 20 Fed. Cas. No. 11,949).

Nor does the fact that this schooner was subsequently repaired by the purchaser show that the sale was not necessary (*Fuller* v. *Kennebec Mut. Ins. Co.*, *supra; Hall* v. *Ocean Ins. Co.*, 37 Fed. 371; *In re Sarah Ann*, 2 Summ. 206, 21 Fed. Cas. No. 12,342). And conceding that counsel's contention is correct, and that the question of necessity is one of law and not of fact (which we are not willing to hold), we think the course pursued by the master in this case was necessary.

One other matter may be briefly mentioned. It appears plainly that Cornell did not consent to the schooner being taken to Kodiak. The owners received nothing from the sale of the ship or cargo. The storm which was encountered near the entrance to Uyak Bay was the proximate cause of its loss, as all the subsequent events depended upon and flowed from the injury to the vessel caused by that storm. These considerations entitle the plaintiff to recover.

Some criticisms are offered upon the instructions of the trial judge. We have read them with care in the light of the strictures made upon them in the briefs of the appellant, and we find no reason to quarrel with them. They were clear and definite, and presented the questions of fact upon which the jury must find very plainly to them, and the court seems to have committed no error of law of any moment in these instructions.

From what has been said it is clear that the demurrer to the complaint was properly overruled, and the motion for a nonsuit properly denied.

The judgment is affirmed.

Lennon, P. J., and Kerrigan, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court April 15, 1918.